JUDGE RAKOFF

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FREE COUNTRY LTD,

                        Plaintiff,                                  Civil Action No.  -CV-

        -against-

                                                                   **COMPLAINT**

BRIAN DRENNEN, MATTHEW VANDER WYDEN
and ROUSSO APPAREL GROUP, INC. and SANTA FE       **16 CV 8746**
APPAREL, LLC,

                        Defendants.

Plaintiff, Free Country LTD. ("Plaintiff" or "Free Country" or "Company"), by its

attorneys, Robinson Brog Leinwand Greene Genovese & Gluck,

against Defendants, alleges as follows:

RECEIVED
NOV 10 2016
CASHIER'S OFFICE
S.D.N.Y.

                            **INTRODUCTION**

1.      This action is brought to remedy the unlawful and disloyal conduct of Defendants

Brian Drennen ("Drennen") and Matthew Vander Wyden ("Vander Wyden"), both former

employees of Free Country, in the theft, retention and misappropriation of Free Country's

confidential, proprietary, and trade secret information, in violation of their agreements and

obligations to Free Country.  By reason of Defendants Drennen's and Vander Wyden's

treachery, they and Defendants Rousso Apparel Group, Inc. ("Rousso") and its affiliate, Santa Fe

Apparel, LLC ("Santa Fe"), possess all of Plaintiff's critical customer information, customer

preferences, purchasing history, pricing and manufacturing costs, profit margins and marketing

plans, product designs, original artwork, tech packs and CADS (hereinafter, the "Confidential

Information"), covering Free Country's product lines that are currently in production and

awaiting shipment to customers, as well as upcoming product lines for 2017. To make matters worse, Defendants are making use of the misappropriated Confidential Information to compete against Plaintiff.

2.     Now that Defendants' misconduct has been uncovered (although the full extent of their wrongdoing has yet to be discovered), by this action, Free Country seeks to hold these Defendants accountable, stopping them from further exploiting Free Country's Confidential Information and putting an immediate halt to the substantial irreparable harm and damages Defendants have caused, and continue to cause Free Country as a result of their unlawful activities.

## **PARTIES**

3.     Plaintiff Free Country is a Delaware limited liability corporation, with an office located at 4 Bryant Park, 9th Floor, New York, New York, 10018. Free Country engages in interstate commerce and designs and manufactures apparel for men, women, and children, including outerwear, cold weather accessories, activewear and swimwear.

4.     Defendant Drennen was formerly employed by Free Country as its Vice President of Sales for its Men's and Ladies activewear and outerwear lines.   Drennen performed this work from Free Country's New York office. He accessed Free Country's servers in New York. Upon information and belief, he is currently employed by Defendant Rousso and/or its affiliate, Santa Fe, with an office located at 525 7th Avenue, 22nd Floor, New York, New York, 10018. He is a resident of the State of New York, residing at 3240 Henry Hudson Parkway, Apt. 3D, Bronx, New York 10463.

5.     Defendant Vander Wyden was formerly employed by Free Country as a Director of Men's Sales. Vander Wyden performed this work from Free Country's New York office.

Upon information and belief, he is currently employed by Defendant Rousso and/or its affiliate, Santa Fe with an office located at 525 7th Avenue, 22nd Floor, New York, New York, 10018. He is a resident of the State of Connecticut, residing at 21 Grey Ledge Drive Guilford, CT 06437.

6.      Upon information and belief, Defendant Rousso is a domestic corporation, with a place of business at 525 7th Avenue, 22nd Floor, New York, New York, 10018. Rousso is owned and operated by Natalie Rousso, Chairwoman, and Victor Rousso, CEO. Rousso designs and manufactures apparel for women. The company offers casual, active, and weekend sportswear collections, including athletic apparel.

7.      Upon information and belief, Defendant Santa Fe Apparel (Santa Fe) is a domestic corporation, with a place of business at 525 7th Avenue, 22nd Floor, New York, New York, 10018. Santa Fe is listed as an affiliate of Rousso on Rousso's website. http://www.roussony.com/sfa.html. Santa Fe designs and manufactures outerwear for young girls, juniors, women and men.

## JURISDICTION AND VENUE

8.      Jurisdiction is proper in this Court under 28 U.S.C. § 1331, as Plaintiff asserts claims arising under the laws of the United States.

9.      Jurisdiction over Plaintiff's state law claims is proper in this Court under 28 U.S.C. § 1367, because those claims are so related to Plaintiff's federal claim that they form part of the same case or controversy.

10.     The Court has jurisdiction over Drennen, Vander Wyden, Rousso and Santa Fe (jointly "Defendants") as they each have done business in New York State and this District and Plaintiff's claims in this action arise out of those contacts.

11.     Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

12.     Free Country is a family-owned business that has been in operation since 1990.

13.     Free Country produces recreational outerwear, cold weather accessories, activewear and swimwear for men, women and children, which it manufactures and sells under its own labels to major retailers and specialty stores, including but not limited to Costco, Walmart, Sam's Club, JC Penney, Kohls, B.J.'s and select specialty stores.  Free Country also manufactures and sells private label apparel.

14.     Free Country sells products under the brand names, "Free Country" and "FreeTech," among others, which are both registered trademarks.  Approximately 63 people work out of Free Country's New York City office.

15.     Free Country has expended substantial resources over the years in cultivating its good will and building its relationship with customers based on several indispensible factors, including but not limited to: The design and quality of its products; its ability to manufacture and deliver its products in a timely and reliable fashion; and its ability to provide finished products to customers at a competitive price point.

16.     By the expenditure of significant resources and the development of its customer relationships through the sales of its products over the years, Free County has accumulated an invaluable wealth of Confidential Information, including customer information including but not limited to buying histories, costs, product and design preferences, pricing, margins and related sales and business data.

17.     Free Country is the sole owner of its Confidential Information, including its confidential, proprietary and trade secret information, which is of great value to Free Country and developed at the cost of millions of dollars by Free Country.  Free Country's Confidential Information is a secret, as it is not known outside of Free Country's business nor is it in the public domain, and Free Country has undertaken significant effort, time, expense and other resources to develop and to maintain its confidentiality.  Such Confidential Information cannot be easily duplicated by others and provides Free Country with a competitive advantage over other companies in the same business.  This competitive advantage would be lost if such Confidential Information became known to the public or Free Country's competitors, who otherwise would have to invest significant time and expense to develop such information independently.

18.     Defendant Rousso and its affiliate, Santa Fe, are competitors of Plaintiff Free Country.  Rousso and Santa Fe also design and manufacture apparel for men, women, and children and provide products through a network of local specialty and department stores in the United States and Canada.

19.     Defendant Drennen was employed by Plaintiff from August 27, 2014 until October 21, 2016.  Drennen worked as the Vice President of Sales, overseeing Free Country's Men's and Ladies' activewear, and was involved with Men's and Ladies' outerwear and swim sales lines.  Defendant Drennen's job was to project, increase and promote the Plaintiff's good will with existing and prospective customers in the marketplace, and to service, solicit and sell to the customers and prospective customers assigned to him by Plaintiff.  Defendant Drennen mostly serviced accounts that belonged to Free Country before he began working for the Company.

20.     Defendant Vander Wyden was employed by Plaintiff as a Director of Men's Sales from November 23, 2015 through October 13, 2016.  Vander Wyden was one of two sales executives for Men's outerwear.  Defendant Vander Wyden's job was to project, increase and promote the Plaintiff's good will with existing and prospective customers in the marketplace, and to service, solicit and sell to, the customers and prospective customers assigned to him by Plaintiff.  Defendant Vander Wyden mostly serviced accounts that belonged to Free Country before he began working for the Company.

21.     By reason of their employment with Free Country, Defendants Drennen and Vander Wyden became privy to and were given access to Free Country's Confidential Information, solely to assist Free Country in servicing its customers.  This Confidential Information included but was not limited to Free Country's aforementioned customer information, as well as Free Country's own internal financial and business information, supplier, sourcing, branding and marketing information, original apparel designs, design packages, apparel production tech packages, original print artwork and CADs – colored detailed renderings of Free Country's product designs.

22.     At all times relevant hereto, Defendants Drennen and Vander Wyden understood that Free Country's Confidential Information belonged to Free Country and could only be used solely in connection with and for the benefit of the Company's business.

23.     As employees of Free Country, Defendants Drennen and Vander Wyden were obligated, by law and contract, to devote their full and utmost loyalty and good faith to Free Country, and were prohibited from engaging in any actions or conduct in violation of these duties, or which competed with, or tended to harm Free Country and/or which would assist or further the interests of a competitor.

24.     From the inception of their employment with Free Country, defendants Drennen and Vander Wyden were advised of their obligations to the Company, which restricted them from stealing Plaintiff's property, misappropriating Plaintiff's Confidential Information and from soliciting Plaintiff's employees.

**The Confidentiality Agreement**

25.     Free Country and Defendants Drennen and Vander Wyden entered into written confidentiality agreements containing enforceable and contractually binding obligations.

26.     Both agreements signed by Drennen and Vander Wyden contain the same language and provisions (hereinafter, collectively, the "Confidentiality Agreement").

27.     On August 27, 2014, at the commencement of his employment with Plaintiff, Drennen signed a Confidentiality Agreement with Free Country.  (Exhibit 1)

28.     Wander Wyden signed a Confidentiality Agreement with Free Country when he commenced his employment with Plaintiff on May 23, 2015.  (Exhibit 2)

29.     The purpose of the Confidentiality Agreement, as set forth in the first paragraph, is as follows:

> 1. Purpose of Agreement. The Company and Employee are entering into this Agreement to memorialize the Company's policies and the Parties' agreement concerning the use and ownership of Confidential Information and to set forth certain restrictions on the activities of Employee to ensure that such Confidential Information is not obtained or used by or for the benefit of any person or entity not authorized by the Company to receive and/or use such information.

30.     Paragraph 3 of the Confidentiality Agreement contains the following definition of "Confidential Information," which states in relevant part:

> 'Confidential Information' means all of the following materials and information (whether or not they are reduced to writing or stored in data format or whether or not they have been, or can be, patented or copyrighted) to which Employee has been given access, is given access or

use or which Employee develops in whole or in part in connection with
his/her employment with the Company or through the use of any of the
facilities or resources of the Company, including without limitation: (i)
any and all specifications, drawings, designs, techniques, processes,
methods, know-how, research, customer lists, customer needs, prices,
costs and marketing, sales and financial information; (ii) any similar or
other trade secret or confidential information of the Company or any
vendor, supplier, distributor, factory, sources or customer of the Company,
regardless of how acquired or developed by the Company or any such
vendor, supplier, distributor . . . .

31.     Significantly, paragraph 5 of the Confidentiality Agreement contains an explicit

acknowledgment concerning the nonuse and nondisclosure of Confidential Information.  For

example, in paragraph 5(a)(iv) of the Confidentiality Agreement, Defendants Drennen and

Vander Wyden acknowledged and agreed to hold Free Country's Confidential Information "in

the strictest of confidence," to use such information solely for the benefit of the Company and

not to use Confidential Information for their own benefit or for the benefit of any third party:

Employee agrees to hold all Confidential Information in the strictest of
confidence and to use the highest degree of care in safeguarding all
Confidential Information against loss, theft or inadvertent disclosure to
unauthorized persons or entities.  Employee may only use, and disclose to
Company employees who need to know, such Confidential Information as
is necessary to perform the business of the Company during the
Employment Period, and Employee shall not at any time during or after
the Employment Period, (i) divulge, disclose or communicate, directly or
indirectly, any Confidential Information to any other person or entity; or
(ii) use any Confidential Information for the benefit of Employee or any
other person or entity other than the Company for any purpose (including,
without limitation, in the solicitation of customers and prospective
customers), without first having obtained the written permission of the
President of the Company or his/her designee, or except as may be
directed by a final, non-appealable court order.  Employee agrees to
comply with the requirements of all customers, prospective customers or
other third parties, concerning the use and disclosure by the Company and
its employees and agents of the confidential and proprietary information of
the confidential and proprietary information of such customers,
prospective customers or other third parties.

32.     Paragraph 5a(vi) of the Confidentiality Agreement prohibits Defendants Drennen and Vander Wyden from maintaining or removing any Confidential Information from Plaintiff's premises and requires the prompt return of all Confidential Information upon demand or termination from employment.

> At no time shall Employee maintain, record or memorialize any Confidential Information in hard copy, or in any electronic format on a computer or electronic storage device, located off, or removed from, the premises of the Company for any reason other than to conduct the business of the Company. Upon demand of the Company or upon termination of the Employee's employment with the Company, Employee will promptly turn over to the Company all records, computers or other electronic devices and any compositions, articles, devices, apparatus and other items in Employee's possession, custody or control that contain, disclose, describe, embody or were derived, in whole or in part from, any Confidential Information in his/her possession, custody and control, including without limitation all Customer and Prospective Customer lists and contact information and each of the items described in paragraph 3, regardless of who prepared such Confidential Information. Upon request by the Company, to ensure compliance with this Agreement, Employee shall deliver to the Company a sworn, notarized statement in a form acceptable to the Company in which Employee attests that he/she has fully complied with the terms of this Agreement.

33.     Paragraph 7 of the Confidentiality Agreement is entitled "Non-Solicitation of Company Employees." Pursuant to this paragraph, Defendants Drennen and Vander Wyden promised, during the term of their employment and for a period of one (1) year after the termination of their employment with the Company for any reason, that they would not solicit any Company employee. For the purpose of this paragraph, the term "Solicit" means:

> (a) [H]iring, soliciting for hire, or offering employment; (b) aiding, encouraging, facilitating, or in any way participating in the recruitment or hire of any Company employee, person or business entity other than the Company; (c) taking any action that would cause, tend to cause or could cause any Company Employee to abandon employment, resign from employment or leave employment by the Company.

34.    Pursuant to paragraph 11 of the Confidentiality Agreement, Defendants Drennen and Vander Wyden agreed to the following:

> In the event of a breach or threatened breach of any of the terms of this Agreement, the Company shall be entitled to an injunction restraining Employee from committing any breach of this Agreement without showing or proving any actual damages and without diminishing any other right or remedy which the Company may have at law or in equity to enforce the provisions of this Agreement. Employee acknowledges a waiver of any rights he/she may have to require the Company to post a bond or other security with respect to obtaining or continuing any injunction or temporary restraining order and, further, Employee releases the Company and its officers and directors and waive any claims for damages against them which Employee may have with respect to the Company obtaining any injunction or restraining order pursuant to this Agreement.

## The Employee Handbook

35.    Free Country also provides each of its employees with an Employee Handbook, which provides further protection for Free Country's trade secrets, confidential and proprietary information.

36.    Defendant Drennen signed an acknowledgment that he received Free Country's Employee Handbook on August 27, 2014. (Exhibit 3)

37.    Defendant Vander Wyden signed an acknowledgment that he received Free Country's Employee Handbook on November 23, 2015. (Exhibit 4)

38.    Free Country's Employee Handbook contains a policy that restricts the use of its "Confidential Information," which includes "information including [Free Country's] designs, specifications, plans, formulae, methods, processes, trade secrets, patents, financial or other business data, business plans and photographs, employee records, prospective customers, customer, supplier and vendor information, pricing of products and services, or other information

regarding [Free Country's] products or services." (See Excerpted Free Country Employee

Handbook, p. 10, Exhibit 5)

39.     Pursuant to Free Country's Employee Handbook policy concerning Confidential

Information, Defendants Drennen and Vander Wyden agreed that they would not, "at any time

whether during [their] employment or at any time after [their] employment terminates for any

reason and regardless of whether said employment is terminated by [Free Country] or by the

employee, divulge or utilize any of the Confidential Information except in the normal course of

[their] duties on behalf of [Free Country]." *Id.*

40.     Additionally, Free Country's Computer, Email and Internet Use policy contains a

subsection "b" entitled "FC Computers, Software, and Information System Tools" that strictly

prohibits Free Country employees from "[t]he unauthorized use, copying, transmittal or deletion

of any electronic information from FC's Computer Facilities...". *Id.,* p. 28.

41.     Subsection "c" of Free Country's Computer, Email and Internet Use policy

entitled "Misuse of Internet" prohibits employees from "[p]lacing, posting or making available

any FC-related content without express authorization . . .," including but not limited to

"confidential information related to FC's services, clients, fiscal matters, vendors and

employees." *Id.*, pp.28-29.  Subsection "d" entitled "Misuse of Electronic Mail (Email)" states

that "Confidential Information must not be shared outside of FC, without authorization, at any

time," *id.,* p. 29, and requires "[a]ll users . . . to take appropriate measures to secure confidential,

privileged, proprietary or sensitive information." *Id.,* p. 30.

42.     Subsection "e" of Free Country's Computer, Email and Internet Use policy

entitled "Use of Laptops, BlackBerrys, Smart Phones and Other Electronic Devices" states in

relevant part:

[A]ny Confidential Information, including FC emails, created on, transmitted by, received from, or stored on any Electronic Device, whether or not issued by FC, remains the sole property of FC and must be kept secured and protected from unauthorized disclosure. *Id.*, p. 30.

43.    Defendants Drennen and Vander Wyden have violated their contractual and fiduciary obligations to maintain the confidentiality of Free Country's Confidential Information.

## Plaintiff's Confidential, Proprietary, and Trade Secret Information

44.    As previously stated, defendants Drennen and Vander Wyden had access to Free Country's Confidential Information covering Free Country's product lines that are currently in production and awaiting shipment to customers, as well as upcoming product lines for 2017.

45.    Upon information and belief, Defendants are already utilizing Free Country's stolen Confidential Information, to solicit Free Country's customers.   Such Confidential Information, including Free Country's original apparel designs, design packages, apparel production tech packages, original print artwork and CADs, are created at significant cost to Free Country

46.    Additionally, Free Country's Confidential Information includes compilations and analysis of a significant amount of customer information, including but not limited to buying histories and patterns, product and design preferences, customer invoices and pricing, margins and profit variances, identity of suppliers, marketing, servicing and related business data.  Free Country makes this information available to its employees to enable them to effectively service customers, address customer needs and offer additional products at suitable prices. The data and Free Country's analysis of the data provides important insight on how Free Country does business, and includes data analytics of sales to every customer and of every product sold.

47.    This extensive data and analysis, to which Defendants had access, is Free Country's Confidential Information, not available to competitors and others, and constitutes Free

Country's trade secrets.  This information was available to Defendants Drennen and Vander Wyden only by virtue of their positions and employment with the Company.  Using this data, an employee at Free Country can isolate markets, customers, specialties, prices, margins, gross profit percentages, product sales, and other confidential data and analysis, to gain a competitive advantage related to individual customers, product categories, pricing and products.  This data and information, which is developed and analyzed by Free Country at substantial cost, has significant economic value to the Company because it is not available to competitors and others.

## Defendants' Misappropriation of Free Country's Confidential Data

48.     On October 13, 2016, Defendant Vander Wyden abruptly announced his resignation from Free Country and left the same day.

49.     On October 19, 2016, Defendant Drennen announced his resignation from Free Country.  His last day of employment with Free Country was October 21, 2016.

50.     Upon their exit from Free Country's employment, both Drennen and Vander Wyden were reminded of their continuing obligation to maintain the confidentiality of Free Country's Confidential Information and to refrain from soliciting Free Country's employees.

51.     Although Vander Wyden did not advise Free Country where he was going next, Drennen did state that he was going to work for a California company selling sports-specific apparel and equipment similar to what he had sold in the past when he was employed by Everlast.

52.     Drennen also told another employee of Free Country that he was going to work for a "wearable technology" company.

53.     In fact, both Drennen and Vander Wyden were going to work for Defendant Rousso and/or its affiliate, Santa Fe, to establish business to directly compete with Free Country.

54.     Upon information and belief, Defendants Vander Wyden and Drennen had obtained job offers from defendants Rousso and/or Santa Fe prior to Vander Wyden's announcement of his resignation on October 13, 2016.

55.     Upon information and belief, Vander Wyden and Drennen deliberately staggered their respective resignations from Free Country by approximately one week to conceal the fact that they were both collectively going to work for defendants Rousso and/or Santa Fe to engage in business to compete against Free Country.

56.     Additionally, upon information and belief, staggering their resignations afforded defendant Drennen more time to access and misappropriate the huge quantities of Free Country Confidential Information that both Vander Wyden and Drennen intended to utilize to compete against Free Country.

57.     Upon information and belief, Drennen and Vander Wyden conspired together to misappropriate Free Country's Confidential Information to start a competitive line of business at Rousso and Santa Fe for the benefit of the Defendants in direct violation of their duties and obligations to Free Country.

58.     On or about October 24, 2016, Free Country learned that Vander Wyden was working at Rousso.

59.     On or about October 25, 2016, Free Country received a telephone call from management of one of its largest customers and was advised that Defendant Drennen had contacted her through electronic mail to announce that he was no longer with Free Country and that he was working for Mtn and Isles.  Mtn and Isles is a recently registered domain name purchased through Santa Fe.  Thereafter, Free Country confirmed that Drennen was working for

Rousso and/or Santa Fe.  Free Country has also learned from other customers that Drennen sent them similar emails.

60.     The information received by Free Country that defendant Drennen was also working for Rousso/Santa Fe contradicted the information that Drennen had previously provided to Free Country when he announced his resignation.

61.     At or around the same time, Free Country received information that both Drennen and Vander Wyden were soliciting Free Country's employees in further violation of their contractual obligations.

62.     At that point, Free Country reviewed its computers and computer systems to determine whether defendants Drennen and Vander Wyden had misappropriated any of Free Country's property.  Specifically reviewed and analyzed were Company laptop computers that had been assigned to Drennen and Vander Wyden during their employment with Free Country. This review showed the improper conduct.

63.     Free Country located evidence on Drennen's Company computer that he used Dropbox to transfer Free Country files prior to his resignation from the Company.  A preliminary forensic examination of Drennen's laptop revealed that Dropbox had been installed on Drennen's computer.  Upon information and belief, Dropbox is a file sharing platform that is commonly used to move files between computers and other electronic devices.  By adding a file into his Dropbox folder on his Free Country laptop, Drennen was able to automatically sync the file with any other computer, smartphone, tablet or other device that also has Dropbox installed.

64.     Drennen's brazen, willful and intentional misappropriation of these files is staggering in both its size and scope.   The content of his Dropbox folder is enormous, consisting of tens of thousands of Free Country files containing most of Free Country's confidential,

proprietary and trade secret information that it has developed for each of its ladies and menswear lines for 2016 and 2017 and many files from 2015.  The preliminary examination of Drennen's laptop revealed that Drennen's Dropbox folder contains 274 GB of data in 5,152 folders and 58,841 files.

65.     Although Dropbox had been installed on Defendant Drennen's computer for some time, virtually all the file activity occurred in the six months prior to his resignation, with almost 50,000 files created in October 2016, shortly before his resignation.  For example, the Dropbox folder shows that on October 13, 2016, the day that Vander Wyden abruptly resigned, 39,601 files totaling 210 GB were created in Drennen's Dropbox account.  Additionally, 5508 files and folders were created on October 18, 2016 between 8:50 am and 9:06 am. This is indicative of file copying given the large number of files and the short elapsed time of the file creation timestamps. This is one day before Mr. Drennan resigned, and three days before he had last access to the computer.

66.     Browser activity on Drennen's computer also supports the attempt to copy corporate data, as well as research on deletions and non-compete agreements. For example, the following searches were made in Yahoo:

| Date | Search Text |
| --- | --- |
| 10/7/2016 | exporting contacts from outlook |
| 10/10/2016 | exporting emails from outlook |
| 10/13/2016 | saving outlook emails as pdf |
| 10/13/2016 | transferring outlook emails to pdf |
| 10/19/2016 | transferring outlook emails to gmail |
| 10/19/2016 | transferring outlook contacts to gmail |
| 10/20/2016 | non compete agreement enforceability |

| 10/21/2016 | deleting applications from windows 10 |

67.     The names of many folders in Drennen's Dropbox folder have the same names as folders stored on Free Country's "S" drive, which is a shared network drive.  The "S" drive is password protected and can only be accessed by authorized users.

68.     Two such folders were named "2016" and "2017", which combined, contained approximately 30,000 files and subfolders and totaled over 200 gigabytes of data.

69.     To put the 2016 and 2017 folders into perspective, the information contained therein consists of virtually all of Free Country's confidential, proprietary and trade secret information for the two years in question, created at considerable expense to Free Country. Summary of files in 2016 and 2017 includes all CADs, production design packages, customer orders, customer specific CADs for past current and future orders, design packages, production technical packages, proprietary print designs and artwork, sourcing information - including fabric and supplier details - sales analysis, internal pricing, margin and gross profit information, branding artwork, logo and product information.

70.     Both the "2016" and "2017" folders were created in Drennen's Dropbox folder on October 13, 2016, the last day of Vander Wyden's employment with Free Country.

71.     Drennen continues to have access to this information via his Dropbox account, despite no longer being a Free Country employee.

72.     The Dropbox folder contained other notable files and folders.  It contained a folder called "Brian - Copy", which appears to be a copy of Drennen's personal work product folder.  The "Brian – Copy" folder contains subfolders of Free Country's customer orders, supplier information, weekly sales analysis, and product lines and other information for each of Free Country's client accounts on which he worked for 2015, 2016 and 2017.

73.     For example, one file contained in the "Brian - Copy" folder entitled "Annual 2016 Costing Sheet – Internal Margins," is an internal cost analysis created by Free Country to enable Free Country to quote appropriate costing to customers to meet their retail pricing and profit margin goals by determining per unit costs, while simultaneously analyzing Free Country profit margins.

74.     Other files found in the "Brian-Copy" folder include copies of customer orders. These customer orders include costs per unit, detailed customer sales plans by week, which projects unit and dollar sales, profit margins, delivery dates, markdown dates and liquidation dates.

75.     The Dropbox folder also contained a copy of defendant Drennen's entire Free Country Outlook folder, which contained all of Drennen's Company emails and correspondence with Free Country customers, employees and vendors, contacts, and related data and attachments.  Notable files attached to Drennen's Company emails include Free Country's weekly sales analysis reports.

76.     Free Country's sales analysis reports of its business with its largest retail customers consist of a compilation of Company information including actual sales data, customer's sales projections and gross margins, which is compared and analyzed and provided to Free Country's sales representatives, including defendants Drennen and Vander Wyden.  Free Country can then use this data to target individual customers through their sales history, buying preferences, pricing, margins, gross profit percentages and other confidential data and analysis, to gain a competitive advantage.  This data and information, which is developed and analyzed by the Company at substantial cost, has significant economic value to the Company because it is not available to competitors and others.

77.     The DropBox folder also included three PST files, which are archives of Microsoft Outlook folders, and include emails, attachments, calendar entries, and the like.  PST files can be created by a user to backup his or her Outlook data for transfer to another device.

78.     The PST files in Drennen's Dropbox folder were named backup.pst, 091616.pst, 101316.pst.  By uploading these PST files to his Dropbox account, Drennen could then download them to another computer and access months or years of Free Country email messages and file attachments that he had archived.

79.     Three other files were called "Contacts – 091616.csv", "Contacts – 100816.csv" and "Contacts – 101916.csv".  A "csv" is a simple file format used to store database information, such as an Outlook contact list.  The three CSV files in the Dropbox folder contain hundreds of Drennen's contact email addresses and contact information exported from his Free Country Microsoft Outlook account.  Upon information and belief, Drennen created the CSV files on September 16, 2016 (091616.csv), October 8, 2016 (100816.csv), and October 19, 2016 (101916.csv), while he was employed by Free Country and he continues to have access to this information.

80.     The Dropbox folder contained another folder called "MALCOLM", which contained a single Word document called "Free Country Big Merchandising Ideas By Lifestyle.docx".  Malcolm Robinson is the Executive Vice President of Brand Development at Free Country, and the Word document contained Malcolm's work product with regard to future Free Country product lines.

81.     All of these documents that Defendant Drennen transferred to his Dropbox account were the property of Free Country and comprised Free Country's Confidential Information.  All of these materials had value because they were not known to or reasonable

available through lawful means by competitors; contained Free Country's confidential, proprietary and trade secret information; and were to be utilized only in the good faith conduct of Free Country's business. All of these documents were obtained and taken from the internal records of Free Country, which are available only to Free Country employees in the lawful conduct of Free Country's business.

82.     Upon information and belief, defendant Drennen, acting individually or with the assistance of Vander Wyden and the other Defendants, misappropriated Free Country's Confidential Information for and unlawful and improper use and is trying to compete unfairly against Free Country.

83.     Prior to Defendant Vander Wyden's and Drennen's resignation from Free Country, the Company had taken reasonable measures to protect its computers and computer systems and the Confidential Information resident thereon, and to prevent unauthorized access to, and disclosure and use of same, and to maintain the confidentiality of its product lines. Plaintiff used password-protected computer systems, limited remote access to those with authority, had its employees sign Confidentiality Agreements and included written policies concerning the restricted use and nondisclosure of Confidential Information in its Employee Handbook.

84.     Free Country's Confidential Information has independent economic value in that it consists of information that is neither generally known nor readily ascertainable within the industry through lawful means. Plaintiff has made reasonable efforts to ensure the secrecy of this information that merits legal protection from unauthorized disclosure, misappropriation, dissemination and/or use.

85.     By letter dated October 27, 2016, counsel for Plaintiff sent Defendants Drennen and Vander Wyden a letter, advising them that Free Country had information that they had wrongfully obtained and retained confidential, proprietary and trade secret information belonging to Free Country in violation of their agreements and obligations to Free Country. (Exhibit 6).  Both Defendants were directed to cease and desist from using any of Free Country's property and to immediately return any Free Country property in their possession, custody or control.  Finally, reserving all rights, Free Country advised Defendants Drennen and Vander Wyden to implement a "litigation hold" to preserve all physical and electronic evidence relating to this matter.  A similar cease and desist letter was sent to defendant Rousso.  (Exhibit 7).

86.     Defendants Drennen and Vander Wyden have failed to respond to this letter.

87.     Defendant Rousso responded by counsel, stating, in relevant part, that "[b]ased on [Rousso's] review of [the] Letter, and consultation with the employees referenced therein, [Rousso] is satisfied in all respects that it is in compliance with its obligations."  (Exhibit 8).

88.     However, Free Country has not received the return of its misappropriated property which Defendants continue to retain and upon information and belief, utilize to compete against Free Country.

89.     Defendants Drennen and Vander Wyden have not only obtained and retained Free Country's confidential, proprietary and trade secret information, but upon information and belief, are unlawfully using such information to, among other things, identify and contact Plaintiff's customers, target their preferences and undercut Plaintiff's pricing, all in an effort to generate business for Defendants Rousso and Santa Fe and to benefit themselves.

90.     Drennen also failed to follow through with his duties and responsibilities prior to his resignation from Free Country.  A buyer from Sam's Club requested certain information from

Drennen in connection with the placement of another order with Free Country. Drennen failed to follow up with the buyer's request and as a result, Free Country was unable to provide the buyer with timely information.

91.     Additionally, Drennen also failed to follow up with important customer communications and failed to follow to secure orders with a customer who had an ongoing program with Free Country.

92.     Upon information and belief, Drennen's aforementioned conduct was part of Defendants' scheme to interfere with and disrupt Free Country's relationships with its existing customers and to wrongfully divert critical business opportunities away from Free Country and towards Defendants' competing business.

93.     As a result of Defendants' conduct, Free Country has suffered damage to its good will with customers, and lost customers. In addition, Free Country faces further future losses of customers and good will as a result of Defendants' improper and unlawful conduct. Further, Plaintiff has had to incur costs and retain counsel forensic consultants to investigate and remedy Defendants' conduct.

94.     Defendants' breaches and violations of contract, law and duty as alleged herein, have damaged and will damage Plaintiff, in that they harm and tend to harm Plaintiff by damaging plaintiff's business good will, interfering with its customer relationships, and resulting in diversion and loss of sales and customers. Plaintiff has suffered and will continue to suffer lost sales, loss in the value of its relationships, and will be forced to incur attorneys' fees and other costs to protect its interests. Free Country's good will with customers has been damaged and interfered with, and its reputation harmed.

95.     Defendants' actions reflect their blatant disregard for legal and contractual

obligations and evinces an intent to continue with these violations.

## FIRST CAUSE OF ACTION
### Violation of Economic Espionage Act, as Amended by Defend Trade Secrets Act

96.     Plaintiff repeats and realleges paragraphs 1 through 95 of this Complaint with the same full force and effect as if fully set forth herein.

97.     During and following their employment with Plaintiff, defendant Drennen misappropriated Plaintiff's Confidential Information, including trade secrets related to products and services used in and intended for use in interstate commerce.  Plaintiff's trade secrets include customer information, including but not limited to buying histories and patterns, product and design preferences, customer invoices and pricing, margins and profit variances, identity of suppliers, marketing, servicing and related business data.  Plaintiff's trade secrets also include its original apparel designs, design packages, apparel production tech packages, original print artwork and CADs, all created at significant cost to Free Country.

98.     Defendants Vander Wyden, Rousso and Santa Fe conspired with Drennen to misappropriate those trade secrets and have received, possessed, and benefitted from them, knowing that they were obtained without authorization. The information that Defendants misappropriated constitutes trade secrets protected by the Economic Espionage Act, as Amended by the Defend Trade Secrets Act, 18 U.S.C. § 1831, *et seq*.

99.     Defendants' misappropriation of Plaintiff's trade secrets was willful and malicious.  Plaintiff is entitled to exemplary damages in an amount up to twice actual damages awarded.

100.     As a direct consequence of Defendants' misappropriation, Plaintiff has suffered damages for actual loss in an amount to be proven at trial, including attorneys' fees and costs.

101.     As a direct consequence of Defendants' misappropriation, Defendants have been unjustly enriched, and Plaintiff is entitled to damages for such enrichment, in an amount to be proven at trial.

102.     As a direct consequence of Defendants' misappropriation, Plaintiff is entitled to injunctive relief, enjoining Defendants, and all those acting in concert or participation with them, from further accessing, using or disclosing Free Country's Confidential Information, from soliciting its employees and from contacting, soliciting or otherwise providing goods or services to any of the customers identified in the Confidential Information.

## SECOND CAUSE OF ACTION
### Misappropriation of Trade Secrets and Confidential Information

103.     Plaintiff repeats and realleges paragraphs 1 through 102 of this Complaint with the same full force and effect as if fully set forth herein.

104.     Plaintiff's Confidential Information consists of confidential, proprietary and trade secret information, that is not public, not readily created or discoverable by others, and which is the product of extensive investment by Plaintiff, both in terms of time and money.  Plaintiff has undertaken extensive efforts to maintain the confidentiality of its Confidential Information, none of which is in the public domain.

105.     Notwithstanding the foregoing, and in complete disregard of Plaintiff's legal rights and Defendants' common-law obligations, Defendant Drennen either acting individually or with the assistance of Vander Wyden, has misappropriated, disclosed and utilized Plaintiff's Confidential Information for his own benefit and for the benefit of the other Defendants. Defendants have utilized and disclosed and/or inevitably will utilize and disclose Plaintiff's Confidential Information, including its trade secrets, which were obtained unlawfully, for their

own benefit, for the purpose of competing against Plaintiff unfairly and to use the information to solicit Plaintiff's actual and prospective customers.

106.   The means used by Defendants in effectuating this misappropriation were intentional, malicious, unlawful, unfair and otherwise improper.

107.   Defendants Rousso and Santa Fe, as the current employer of Defendants Drennen and Vander Wyden, are liable for their own actions, and/or for the actions of its employees under a theory of respondent superior.

108.   These actions by Defendants have caused or threaten to cause irreparable harm to Plaintiff, including but not limited to the injury to its goodwill, reputation, customer relationships, competitive advantage, revenues and profits which are impossible to accurately and fully calculate, all for which Plaintiff has no adequate remedy at law.

109.   As a direct and proximate result of the wrongful acts of Defendants, Plaintiff Free Country has been injured financially and will incur further damages in an amount to be proven at trial.

110.   Plaintiff is entitled to punitive damages in that the conduct of the Defendants was willful, wanton and malicious.

111.   As a direct consequence of Defendants' misappropriation, Plaintiff is entitled to preliminary and permanent injunctive relief, enjoining Defendants, and all those acting in concert or participation with them, from further accessing, using or disclosing Free Country's Confidential Information, from soliciting its employees and from contacting, soliciting or otherwise providing goods or services to any of the customers identified in the Confidential Information.

## THIRD CAUSE OF ACTION
### Breach of Duty of Fiduciary Duty

112.    Plaintiff repeats and realleges paragraphs 1 through 111 of this Complaint with the same full force and effect as if fully set forth herein.

113.    As employees of Plaintiff, Defendants Drennen and Vander Wyden owed a fiduciary duty to Plaintiff.

114.    Among other things, Defendants Drennen and Vander Wyden had a common-law duty to refrain from acting in a manner that was contrary to Plaintiff's best interests, including by using confidential, proprietary and trade secret information procured during their employment with Plaintiff for any purpose other than for the benefit of Plaintiff, and not to use Plaintiff's Confidential Information for their own pecuniary gain.

115.    Defendants Drennen and Vander Wyden were and are under a duty both to keep Plaintiff's Confidential Information confidential and not to use, exploit or divert such information on behalf of themselves or others or to use it for the benefit of anyone other than Plaintiff.

116.    As detailed above, Defendant Drennen, either acting individually and/or collectively with Vander Wyden, breached the duties owed to Plaintiff by, among other things, and in derogation of Plaintiff's interests: (1) knowingly and willfully transferring Plaintiff's Confidential Information to a personal DropBox account; (2) using Free Country's facilities to set up a competing business; (3) upon information and belief, using such Confidential Information in connection with their new employment by Defendants Rousso and Santa Fe to compete against Plaintiff unfairly; (4) engaging in conduct adverse to the interests of Plaintiff; and (5) upon information and belief, soliciting Plaintiff's employees to leave Plaintiff to work at Defendants Rousso and/or Santa Fe so as to cripple Plaintiff and weaken it as a competitor.

117.    As a direct and proximate result of the wrongful conduct of Defendants Drennen and Vander Wyden, as detailed above, Plaintiff has suffered, and continues to suffer, immediate, irreparable and unquantifiable damages, including but not limited to the injury to its goodwill, reputation, customer relationships, competitive advantage, revenues and profits that are impossible to accurately and fully calculate, all for which Plaintiff has no adequate remedy at law.

118.    As a direct and proximate result of the wrongful acts of Defendants Drennen and Vander Wyden, Plaintiff has been injured financially and will incur further damages in an amount to be proven at trial.  Plaintiff is entitled to preliminary and permanent injunctive relief, enjoining Defendants, and all those acting in concert or participation with them, from further accessing, using or disclosing Free Country's Confidential Information, from soliciting its employees and from contacting, soliciting or otherwise providing goods or services to any of the customers identified in the Confidential Information.

119.    Plaintiff entitled to punitive damages in that the conduct of these Defendants was willful, wanton and malicious.

## FOURTH CAUSE OF ACTION
### (Breach of Duty of Loyalty/Faithless Servant)

120.    Plaintiff repeats and realleges paragraphs 1 through 119 of this Complaint with the same force and effect as if fully set forth herein.

121.    While in Plaintiff's employ, Defendants Drennen and Vander Wyden owed Plaintiff the utmost duty of loyalty and could not use Plaintiff's time, resources or facilities for their own benefit.

122.    Defendants Drennen and Vander Wyden breached that duty of loyalty by, among other things, using Plaintiff's time, facilities and/or resources for their own personal benefit and

to compete unlawfully with Plaintiff by, among other things, and in derogation of Plaintiff's interests: (1) knowingly and willfully transferring Plaintiff's Confidential Information to a personal DropBox account; (2) upon information and belief, using such Confidential Information in connection with their new employment by Defendants Rousso and Santa Fe to compete against Plaintiff unfairly; (3) engaging in conduct adverse to the interests of Plaintiff; and (4) upon information and belief, soliciting Plaintiff's employees to leave Plaintiff to work at Defendants Rousso and/or Santa Fe so as to cripple Plaintiff and weaken it as a competitor.

123.    As such, Defendants Drennen and Vander Wyden are faithless servants and Plaintiff is entitled to all damages that it has sustained by virtue of the aforementioned conduct, in an amount to be determined at trial, including the disgorgement of all compensation, including commissions, Defendants Drennen and Vander Wyden received from Plaintiff during their respective periods of disloyalty, without regard to whether Plaintiff suffered any damages by reason of their faithless acts.

124.    Defendants are, upon information and belief, still in possession of Plaintiff's Confidential Information and, on information and belief, are able to access and use this information on behalf of Plaintiff's competitors, defendants Rousso and Santa Fe.  Further, upon information and belief, Defendants shared this Confidential Information with others who may use, or are using the information to Plaintiff's detriment.

125.    As a direct and proximate result of the disloyalty of Defendants Drennen and Vander Wyden, Plaintiff has been irreparably injured, and has suffered damages in an amount to be determined at trial. Because its remedy at law is inadequate, Plaintiff seeks, in addition to its damages, preliminary and permanent injunctive relief, enjoining Defendants, and all those acting in concert or participation with them, from further accessing, using or disclosing Free Country's

Confidential Information, from soliciting its employees and from contacting, soliciting or

otherwise providing goods or services to any of the customers identified in the Confidential

Information.

## FIFTH CAUSE OF ACTION
### (Aiding and Abetting Breach of Fiduciary Duty and Duty of Loyalty)

126.    Plaintiff repeats and realleges paragraphs 1 through 125 of this Complaint with

the same full force and effect as if fully set forth herein.

127.    Upon information and belief, Defendants Rousso and Santa Fe know that the

Confidential Information was wrongfully taken from Plaintiff in breach of Defendants Drennen's

and Vander Wyden's fiduciary duties, and has rendered substantial assistance to Defendants

Drennen and Vander Wyden in their breaches of duty, including by encouraging Defendants

Drennen and Vander Wyden to obtain such Confidential Information and to provide such

information to Defendants Rousso and Santa Fe.

128.    Upon information and belief, Defendants Rousso and Santa Fe have exploited

Plaintiff's Confidential Information for their own benefit.

129.    As a direct and proximate result of the wrongful acts of Defendants Rousso and

Santa Fe, Plaintiff has been injured financially and will incur further damages in an amount to be

proven at trial.

130.    Plaintiff will continue to be irreparably harmed unless Defendants are directed to

return the Confidential Information to Plaintiff, are enjoined from accessing, using or disclosing

using the Confidential Information, enjoined from soliciting Free Country's employees and

enjoined from contacting, soliciting or otherwise providing goods or services to any of the

customers identified in the Confidential Information.

131.    Plaintiff is entitled to punitive damages in that the wrongful conduct of Defendants Rousso and Santa Fe conduct was willful, wanton and malicious.

## SIXTH CAUSE OF ACTION
### (Unfair Competition Against All Defendants)

132.    Plaintiff repeats and realleges paragraphs 1 through 131 of this Complaint with the same full force and effect as if fully set forth herein.

133.    Defendants, on information and belief, knowingly performed acts to pirate away the fruits of Plaintiff's customer base, including, but not limited to: interfering with the prospective economic advantage Plaintiff has with its customers, diverting and attempting to divert the customers through the use of trade secrets misappropriated from Plaintiff, and by engaging in the other acts alleged herein.

134.    Defendants conduct constitutes unfair competition under New York law.  As a direct and proximate consequence of the foregoing, Plaintiff has suffered and continues to suffer, immediate, irreparable and unquantifiable damages, including but not limited to injury to its goodwill, reputation, customer relationships, competitive advantage, revenues and profits that are impossible to accurately and fully calculate and for which it has no adequate remedy at law. Plaintiff will continue to be irreparably harmed unless Defendants are directed to return the Confidential Information to Plaintiff, are enjoined from accessing, using or disclosing the Confidential Information and enjoined from soliciting Free Country's employees or from contacting, soliciting or otherwise providing goods or services to any of the customers identified in the Confidential Information.

135.    In addition, Plaintiff is entitled to all damages that it has sustained by virtue of the aforementioned conduct, in an amount to be determined at trial, including, without limitation,

Defendants' profits and gains arising from the wrongful acts described herein, Plaintiff's lost profits, attorneys fees', costs and interest.

136.   Plaintiff is entitled to punitive damages in that the Defendants' conduct was willful, wanton and malicious.

## SEVENTH CAUSE OF ACTION
### (Tortious Interference with Prospective Advantage Against All Defendants)

137.   Plaintiff repeats and realleges paragraphs 1 through 136 of this Complaint with the same full force and effect as if fully set forth herein.

138.   Plaintiff had a reasonable expectation of continued business with its customers, many of which have been doing business with Plaintiff for years.

139.   Defendants have interfered with Plaintiff's reasonable expectation of continued business using wrongful means, i.e., including by taking and making use of the Confidential Information that Defendant Drennen misappropriated from Plaintiff either individually or collectively with the assistance of Defendant Vander Wyden, by illegally and improperly accessing Plaintiff's computers and computer systems, which they took and are using to compete against Plaintiff.

140.   As a direct and proximate result of Defendants' actions, as detailed above, Plaintiff has suffered, and continues to suffer, immediate, irreparable and unquantifiable damages, including but not limited to the loss of goodwill, reputation, customer relationships, competitive advantage, revenues and profits that are impossible to accurately and fully calculate, all for which Plaintiff has no adequate remedy at law.

141.   As a direct and proximate result of Defendants' wrongful acts, Plaintiff has sustained and will incur further damages in an amount to be proven at trial.  Plaintiff will continue to be irreparably harmed unless Defendants are directed to return the Confidential

Information to Plaintiff, are enjoined from accessing, using or disclosing the Confidential Information, enjoined from soliciting Free Country's employees and enjoined from contacting, soliciting or otherwise providing goods or services to any of the customers identified in the Confidential Information.

142.    Plaintiff is entitled to punitive damages in that the Defendants' conduct was willful, wanton and malicious.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### (Breach of Contract Against Defendants Drennen and Vander Wyden)

143.    Plaintiff repeats and realleges paragraphs 1 through 142 of this Complaint with the same full force and effect as if fully set forth herein.

144.    The Confidentiality Agreements signed by Defendants Drennen and Vander Wyden are valid, binding and enforceable agreements. (See Exhibits 1 and 2).

145.    Pursuant to the Confidentiality Agreement, Defendants Drennen and Vander Wyden were obligated to, *inter alia*: keep confidential, both during and subsequent to their employment with Plaintiff, all of Plaintiff's confidential, proprietary, and trade secret information.  Defendants Drennen and Vander Wyden were further obligated to hold Plaintiff's Confidential Information "in the strictest of confidence," to use such information solely for the benefit of the Company and not to use Confidential Information for their own benefit or for the benefit of any third party.

146.    Pursuant to the Confidentiality Agreement, Defendants Drennen and Vander Wyden also promised to refrain from soliciting Plaintiff's employees.

147.    In breach of their contractual obligations, Defendant s Drennen and Vander Wyden misappropriated Plaintiff's confidential, proprietary, and trade secret information to use

for their own benefit and for the benefit of the other Defendants, to unfairly compete with Plaintiff.

148.    In breach of their contractual obligations, Defendants Drennen and Vander Wyden have also solicited Plaintiff's employees.

149.    As a direct and proximate cause of Defendants' breach, Plaintiff has suffered extensive damage, the exact amount to be determined at trial.

150.    In the event of a breach of threatened breach of the Confidentiality Agreement, paragraph 11 entitles Plaintiff to an injunction without having to show or prove actual damages and without having to post a bond. (See Exhibits 1 and 2, ¶ 11).

151.    Plaintiff will continue to be directly and proximately damaged, and its good will irreparably harmed, if Defendants Drennen and Vander Wyden are not enjoined from further violation of these agreements and prohibited from accessing, using and disclosing Plaintiff's Confidential Information, soliciting its employees and contacting, soliciting or otherwise providing goods or services to any of the customers identified in the Confidential Information. Plaintiff has no adequate remedy at law as money damages alone will not fully compensate Plaintiff, and injunctive relief is warranted to prevent further irreparable harm to Plaintiff.

152.    Plaintiff accordingly seeks damages and preliminary and permanent injunctive relief.

## AS AND FOR AN NINTH CAUSE OF ACTION
### (Unjust Enrichment)

153.    Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "152" above as if fully set forth herein.

154.    Defendants have profited from the aforementioned acts committed against Plaintiff and therefore, Defendants have been unjustly enriched at Plaintiff's expense.

155.    It would be unjust to allow Defendants to retain the benefit of profiting at the expense of Plaintiff as a result of the foregoing.

156.    By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial.

**WHEREFORE**, Plaintiff demands a judgment against Defendants as follows:

A.    Awarding damages as described in each of the above claims, in favor of Plaintiff and against Defendants in amounts to be determined at trial, and further directing forfeiture and disgorgement of all amounts paid by Plaintiff to Defendants Drennen and Vander Wyden during the period of disloyalty;

B.    Granting a temporary and permanent injunction against Defendants, enjoining them from violating their legal and contractual duties to Plaintiff, from accessing, using or disclosing Plaintiffs confidential, proprietary and trade secret information, from soliciting Plaintiff's employees, from contacting, soliciting or otherwise providing goods or services to any of the customers identified in the Confidential Information and directing the return of all of Plaintiff's property, whose data was misappropriated while Defendants Drennen and Vander Wyden were employed by Plaintiff;

C.    Awarding punitive damages in favor of Plaintiff and against Defendants, the exact amount to be determined at trial;

D.    Awarding Plaintiff pre-judgment and post-judgment interest, and its attorneys' fees, costs and other expenses incurred in this action; and

E.    Granting Plaintiff such other and further relief as this Court deems just, proper and equitable.

Dated:   New York, New York
         November 10, 2016

ROBINSON BROG LEINWAND GREENE
GENOVESE & GLUCK P.C.

By: _____
Felicia S. Ennis, Esq.
fse@robinsonbrog.com
Michael Eisenberg, Esq.
mae@robinsonbrog.com
*Attorneys for Plaintiff*
875 Third Avenue – 9th Floor
New York, New York 10022
Tel. (212) 603-6300

# EXHIBIT 1

## ~~RBLGGG DRAFT~~ 02.07.14

## FREE COUNTRY, LTD.

### CONFIDENTIALITY AGREEMENT

$27\overset{th}{\phantom{.}}$  August

This Confidentiality Agreement ("Agreement") is made on the ~~4th~~ day of ~~April~~ 2014, between Free Country, LTD. ("Company" or "Employer") and __Brian M. Drehnen__ ("Employee").

In consideration of the (1) initial employment of Employee by the Company on an at-will basis and/or continued employment with the Company; (2) training of Employee and Employee's experience in the business activities of the Company, and any supervisory functions, which Company has given, or may give, to Employee during his/her employment with the Company; (3) access to Confidential Information (as defined in Section 3 below); (4) in person, telephonic, mail or other contact with Customers, Prospective Customers and employees, vendors and agents of the Company or any of its affiliates; and (5) other valuable consideration received by Employee during the period from the Effective Date through the Termination Date, the Parties each agree, as follows:

1.      Purpose of Agreement. The Company and Employee are entering into this Agreement to memorialize the Company's policies and the Parties' agreement concerning the use and ownership of Confidential Information and to set forth certain restrictions on the activities of Employee to ensure that such Confidential Information is not obtained or used by or for the benefit of any person or entity not authorized by the Company to receive and/or use such information.

2.      Effectiveness and Effect on Prior Agreements. Employee agrees and acknowledges that this Agreement is effective only from the date it is signed and supersedes all prior agreements between the parties.

3.      "Confidential Information" means all of the following materials and information (whether or not they are reduced to writing or stored in data format or whether or not they have been, or can be, patented or copyrighted) to which Employee has been given access, is given access or use or which Employee develops in whole or in part in connection with his/her employment with the Company or through the use of any of the facilities or resources of the Company, including without limitation: (i) any and all specifications, drawings, designs, techniques, processes, methods, know-how, research, customer lists, customer needs, prices, costs and marketing, sales and financial information; (ii) any similar or other trade secret or confidential information of the Company or any vendor, supplier, distributor, factory, sources or customer of the Company, regardless of how acquired or developed by the Company or any such vendor, supplier, distributor; and (iii) any and all information relating to the Schwartz family, and each of their family members, friends, acquaintances, business associates, trustees, contractors, employees, visitors, suppliers and/or staff, including but not limited in each case to

{00660599.DOC;1 }

1

information regarding their personal life, characteristics, views, conduct, background, business or financial interests or transactions, finances, leisure interests, relationships, physical and mental health, residence, travel plans and habits, all images in any format or media whatsoever and any other information which Employee is told is confidential or which Employee might reasonably expect to regard as confidential.

4.      Exceptions.  "Confidential Information" shall not include information that: (i) is or becomes generally available to the public other than as a result of unauthorized disclosure; (ii) is rightfully disclosed to Employee by a third party without any breach of the confidentiality obligations hereunder; or (iii) was known to Employee before such information was disclosed by the Company.  Notwithstanding the foregoing restrictions, Employee may use and disclose Confidential Information to the extent obligated by law.  Employee shall endeavor to provide Company with reasonable notice of the required disclosure in order to provide Company with an opportunity, if the Company deems necessary, to obtain reasonable protection for the confidential information in connection with such disclosure.

5.      Nondisclosure and Nonuse of Confidential Information.

   a.     Employee acknowledges and agrees:

      i.      The Company has acquired or developed and will continue to acquire and develop, certain trade secrets and other Confidential Information, through substantial expenditures of time, effort and money, which are of such value and nature as to make it reasonable and necessary for the protection of the Company's business interests that Employee not compete with the Company during the Employment Period and not disclose or use (except as provided herein) any Confidential Information.

      ii.     During the Employment Period, Employee will be employed by the Company in a position involving the trust of the Company and will have access to Confidential Information.

      iii.    In the course of his/her employment with the Company, or through his/her use of the facilities or resources of the Company, Employee may develop or contribute to the development of Confidential Information.

      iv.     Employee agrees to hold all Confidential Information in the strictest of confidence and to use the highest degree of care in safeguarding all Confidential Information against loss, theft or inadvertent disclosure to unauthorized persons or entities.  Employee may only use, and disclose to Company employees who need to know, such Confidential Information as is necessary to perform the business of the Company during the Employment Period, and Employee shall not at any time during or after the Employment Period, (i) divulge, disclose or communicate, directly or indirectly, any Confidential Information to any other person or entity; or (ii) use any Confidential Information for the benefit of Employee or any other person or entity other than the Company for any purpose (including, without limitation, in the solicitation of

customers and prospective customers), without first having obtained the written permission of the President of the Company or his/her designee, or except as may be directed by a final, non-appealable court order. Employee agrees to comply with the requirements of all customers, prospective customers or other third parties, concerning the use and disclosure by the Company and its employees and agents of the confidential and proprietary information of such customers, prospective customers or other third parties.

      v.     The obligation to treat information as Confidential Information shall, with respect to each piece of Confidential Information, survive the termination of Employee's employment with the Company and shall continue for so long as such piece of information continues to meet the definition of Confidential Information as set forth in paragraph 3.

      vi.    At no time shall Employee maintain, record or memorialize any Confidential Information in hard copy, or in any electronic format on a computer or electronic storage device, located off, or removed from, the premises of the Company for any reason other than to conduct the business of the Company. Upon demand of the Company or upon termination of the Employee's employment with the Company, Employee will promptly turn over to the Company all records, computers or other electronic devices and any compositions, articles, devices, apparatus and other items in Employee's possession, custody or control that contain, disclose, describe, embody or were derived, in whole or in part from, any Confidential Information in his/her possession, custody and control, including without limitation all Customer and Prospective Customer lists and contact information and each of the items described in paragraph 3, regardless of who prepared such Confidential Information. Upon request by the Company, to ensure compliance with this Agreement, Employee shall deliver to the Company a sworn, notarized statement in a form acceptable to the Company in which Employee attests that he/she has fully complied with the terms of this Agreement.

      vii.   Employee shall inform the Company immediately of any request or subpoena seeking disclosure of any Confidential Information and shall immediately forward a copy of any such request or subpoena to the President of the Company, so that the Company has the opportunity to contest and protect against improper disclosure.

      6.     <u>Ownership of Confidential Information</u>. Employee acknowledges and agrees that any Confidential Information is the sole property of the Company and agrees to keep such information confidential and to use them only for the business interests of the Company and for no other company.

      7.     <u>Non-Solicitation of Company Employees</u>. Employee promises that, during the term of his/her employment and for a period of one (1) year after the termination of his/her employment with the Company for any reason, he/she will not Solicit any Company Employee. For the purposes of this paragraph, the term "Solicit" means: (a) hiring, soliciting for

{00660599.DOC;1 }

hire, or offering employment; (b) aiding, encouraging, facilitating, or in any way participating in the recruitment or hire of any Company employee, person or business entity other than the Company; (c) taking any action that would cause, tend to cause or could cause any Company Employee to abandon employment, resign from employment or leave employment by the Company. The term "Employee" means any person that is employed by the Company or any person that is or was employed by the Company during any part of the six (6) month period immediately preceding the termination of my employment by the Company.

8.     Not an Agreement of Employment.  Nothing in this Agreement or in any other agreement between the Company and Employee shall be construed to limit in any way the right of the Company to terminate the employment or service of the Employee at any time, or be evidence of any agreement or understanding, express or implied, that the Company will retain the Employee in any particular position, at any particular rate of compensation or for any particular period of time, it being expressly acknowledged and agreed by the Employee that his/her employment with the Company is governed by the terms of the offer letter.

9.     Successors and Assigns.  This Agreement is personal in nature, and neither this Agreement nor any part of any obligation herein shall be assignable by Employee. The Company shall be entitled to assign this Agreement to (a) any corporation resulting from any merger, consolidation or other reorganization to which the Company is a party or (b) any corporation, partnership, association or other person to which the Company may transfer all or substantially all of the assets and business of the Company existing at such time.

10.     Modification.  No modification of this Agreement shall be valid unless authorized by the President of the Company and set forth in a writing executed by Employee and a duly authorized representative of the Company.  The Parties hereto agree that in no event shall an oral modification of this Agreement be enforceable or valid.

11.     Enforcement.  In the event of a breach or threatened breach of any of the terms of this Agreement, the Company shall be entitled to an injunction restraining Employee from committing any breach of this Agreement without showing or proving any actual damages and without diminishing any other right or remedy which the Company may have at law or in equity to enforce the provisions of this Agreement.  Employee acknowledges a waiver of any rights he/she may have to require the Company to post a bond or other security with respect to obtaining or continuing any injunction or temporary restraining order and, further, Employee releases the Company and its officers and directors and waive any claims for damages against them which Employee may have with respect to the Company obtaining any injunction or restraining order pursuant to this Agreement.

12.     Severability and Judicial Modification of Agreement.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, assigns, legal representatives, heirs and distributees. This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to conflicts of law principles.  If any restrictions shall for any reason be held by a court of competent jurisdiction to be excessively broad as to duration, activity or subject, such restriction shall be construed so as to be limited or reduced to be enforceable to the extent compatible with applicable law as it shall then appear, it being understood that by the execution of this

Agreement the parties hereto regard the restrictions contained herein as reasonable and compatible with their respective rights. Subject to the prior sentence, the invalidity or unenforceability of any provision in this Agreement shall not affect any other provisions hereof, and this Agreement shall be construed as if such invalid or any unenforceable provision were omitted.

13.   Jurisdiction.  All actions and proceedings relating directly or indirectly to this Agreement shall be litigated in any Federal or State Court having situs in New York County, New York, or by mutual agreement of the Parties, any other court, and that such courts are convenient forums and that both Parties hereby submit to the personal jurisdiction and venue of such courts.

14.   Construction.  Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision will be effective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement, and the remainder of such provision and the remaining provisions of this Agreement shall be interpreted, to the maximum extent possible, so as to conform to the original intent of this Agreement.

15.   Amendment; Waiver.  This Agreement may be amended, superseded, modified, supplemented or terminated, and the terms hereof may be waived, only by written instrument signed by the Parties or, in the case of a waiver, by the Party waiving compliance. No delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof. No waiver on the part of any Party of any such right, power or privilege, nor any single or partial exercise of any such right, power or privilege, shall preclude any further exercise thereof or the exercise of any other such right, power or privilege. The rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies that any Party may otherwise have at law or in equity. Each party hereby waives any right to trial by jury on any claim, counterclaim, setoff, demand action or cause of action whatsoever between them, arising out of or in any way pertaining or relating to this Agreement.

16.   Entire Agreement.  From and after the date of this Agreement, the provisions of this Agreement will control the rights and obligations of the Parties hereto with respect to the subject matter hereof. However, reference is made to Section 2 hereof with respect to the rights and obligations of the parties hereto with respect to any breach of a prior agreement between the Parties, if any, relating to confidentiality, non-competition and non-solicitation arising prior to the effective date hereof.

17.   Acknowledgment.  Employee has carefully read all of the provisions of this Agreement and agrees that (1) the same are necessary for the reasonable and proper protection of the business of the Company, (2) the Company has been induced to enter into and/or continue its employment relationship with Employee in reliance upon his/her compliance with the provisions of this Agreement, (3) every provision of this Agreement is reasonable with respect to its scope and duration, (4) Employee has executed this Agreement without duress or coercion from any source, and (5) Employee has received a copy of this Agreement.

{00660599.DOC.1 }

5

18.     Knowing and Voluntary Execution.  Employee states and represents that he/she has carefully read and understood the foregoing Agreement, and that if Employee executes the Agreement, he/she has executed the same knowingly and voluntarily of his/her own free will, without any duress, being fully informed, after due deliberation and after sufficient time and opportunity to consult with the counsel of his choice.

19.     Advise New Employers.  Employee will, prior to accepting employment with any new employer, inform such employer of this Agreement and provide such employer with a copy of this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year first above written.

EMPLOYER:

Free Country, LTD.

By: _____

EMPLOYEE:

_____

By: _Brian M_____   8/27/14

EXHIBIT 2

RBLGGG DRAFT-02.07.14

# *FREE COUNTRY, LTD.*

## CONFIDENTIALITY AGREEMENT

This Confidentiality Agreement ("Agreement") is made on the 4th day of April 2014, between Free Country, LTD. ("Company" or "Employer") and _Matthew Vander Wrden_ ("Employee").

In consideration of the (1) initial employment of Employee by the Company on an at-will basis and/or continued employment with the Company; (2) training of Employee and Employee's experience in the business activities of the Company, and any supervisory functions, which Company has given, or may give, to Employee during his/her employment with the Company; (3) access to Confidential Information (as defined in Section 3 below); (4) in person, telephonic, mail or other contact with Customers, Prospective Customers and employees, vendors and agents of the Company or any of its affiliates; and (5) other valuable consideration received by Employee during the period from the Effective Date through the Termination Date, the Parties each agree, as follows:

1. Purpose of Agreement. The Company and Employee are entering into this Agreement to memorialize the Company's policies and the Parties' agreement concerning the use and ownership of Confidential Information and to set forth certain restrictions on the activities of Employee to ensure that such Confidential Information is not obtained or used by or for the benefit of any person or entity not authorized by the Company to receive and/or use such information.

2. Effectiveness and Effect on Prior Agreements. Employee agrees and acknowledges that this Agreement is effective only from the date it is signed and supersedes all prior agreements between the parties.

3. "Confidential Information" means all of the following materials and information (whether or not they are reduced to writing or stored in data format or whether or not they have been, or can be, patented or copyrighted) to which Employee has been given access, is given access or use or which Employee develops in whole or in part in connection with his/her employment with the Company or through the use of any of the facilities or resources of the Company, including without limitation: (i) any and all specifications, drawings, designs, techniques, processes, methods, know-how, research, customer lists, customer needs, prices, costs and marketing, sales and financial information; (ii) any similar or other trade secret or confidential information of the Company or any vendor, supplier, distributor, factory, sources or customer of the Company, regardless of how acquired or developed by the Company or any such vendor, supplier, distributor; and (iii) any and all information relating to the Schwartz family, and each of their family members, friends, acquaintances, business associates, trustees, contractors, employees, visitors, suppliers and/or staff, including but not limited in each case to

{00660599.DOC;1 }

1

information regarding their personal life, characteristics, views, conduct, background, business or financial interests or transactions, finances, leisure interests, relationships, physical and mental health, residence, travel plans and habits, all images in any format or media whatsoever and any other information which Employee is told is confidential or which Employee might reasonably expect to regard as confidential.

    4.    Exceptions. "Confidential Information" shall not include information that: (i) is or becomes generally available to the public other than as a result of unauthorized disclosure; (ii) is rightfully disclosed to Employee by a third party without any breach of the confidentiality obligations hereunder; or (iii) was known to Employee before such information was disclosed by the Company. Notwithstanding the foregoing restrictions, Employee may use and disclose Confidential Information to the extent obligated by law. Employee shall endeavor to provide Company with reasonable notice of the required disclosure in order to provide Company with an opportunity, if the Company deems necessary, to obtain reasonable protection for the confidential information in connection with such disclosure.

    5.    Nondisclosure and Nonuse of Confidential Information.

    a.    Employee acknowledges and agrees:

    i.    The Company has acquired or developed and will continue to acquire and develop, certain trade secrets and other Confidential Information, through substantial expenditures of time, effort and money, which are of such value and nature as to make it reasonable and necessary for the protection of the Company's business interests that Employee not compete with the Company during the Employment Period and not disclose or use (except as provided herein) any Confidential Information.

    ii.    During the Employment Period, Employee will be employed by the Company in a position involving the trust of the Company and will have access to Confidential Information.

    iii.    In the course of his/her employment with the Company, or through his/her use of the facilities or resources of the Company, Employee may develop or contribute to the development of Confidential Information.

    iv.    Employee agrees to hold all Confidential Information in the strictest of confidence and to use the highest degree of care in safeguarding all Confidential Information against loss, theft or inadvertent disclosure to unauthorized persons or entities. Employee may only use, and disclose to Company employees who need to know, such Confidential Information as is necessary to perform the business of the Company during the Employment Period, and Employee shall not at any time during or after the Employment Period, (i) divulge, disclose or communicate, directly or indirectly, any Confidential Information to any other person or entity; or (ii) use any Confidential Information for the benefit of Employee or any other person or entity other than the Company for any purpose (including, without limitation, in the solicitation of

customers and prospective customers), without first having obtained the written permission of the President of the Company or his/her designee, or except as may be directed by a final, non-appealable court order. Employee agrees to comply with the requirements of all customers, prospective customers or other third parties, concerning the use and disclosure by the Company and its employees and agents of the confidential and proprietary information of such customers, prospective customers or other third parties.

v.     The obligation to treat information as Confidential Information shall, with respect to each piece of Confidential Information, survive the termination of Employee's employment with the Company and shall continue for so long as such piece of information continues to meet the definition of Confidential Information as set forth in paragraph 3.

vi.     At no time shall Employee maintain, record or memorialize any Confidential Information in hard copy, or in any electronic format on a computer or electronic storage device, located off, or removed from, the premises of the Company for any reason other than to conduct the business of the Company. Upon demand of the Company or upon termination of the Employee's employment with the Company, Employee will promptly turn over to the Company all records, computers or other electronic devices and any compositions, articles, devices, apparatus and other items in Employee's possession, custody or control that contain, disclose, describe, embody or were derived, in whole or in part from, any Confidential Information in his/her possession, custody and control, including without limitation all Customer and Prospective Customer lists and contact information and each of the items described in paragraph 3, regardless of who prepared such Confidential Information. Upon request by the Company, to ensure compliance with this Agreement, Employee shall deliver to the Company a sworn, notarized statement in a form acceptable to the Company in which Employee attests that he/she has fully complied with the terms of this Agreement.

vii.     Employee shall inform the Company immediately of any request or subpoena seeking disclosure of any Confidential Information and shall immediately forward a copy of any such request or subpoena to the President of the Company, so that the Company has the opportunity to contest and protect against improper disclosure.

6.     <u>Ownership of Confidential Information</u>.  Employee acknowledges and agrees that any Confidential Information is the sole property of the Company and agrees to keep such information confidential and to use them only for the business interests of the Company and for no other company.

7.     <u>Non-Solicitation of Company Employees</u>.  Employee promises that, during the term of his/her employment and for a period of one (1) year after the termination of his/her employment with the Company for any reason, he/she will not Solicit any Company Employee. For the purposes of this paragraph, the term "Solicit" means: (a) hiring, soliciting for

{00660599.DOC;1 }

3

hire, or offering employment; (b) aiding, encouraging, facilitating, or in any way participating in the recruitment or hire of any Company employee, person or business entity other than the Company; (c) taking any action that would cause, tend to cause or could cause any Company Employee to abandon employment, resign from employment or leave employment by the Company. The term "Employee" means any person that is employed by the Company or any person that is or was employed by the Company during any part of the six (6) month period immediately preceding the termination of my employment by the Company.

8.    Not an Agreement of Employment.  Nothing in this Agreement or in any other agreement between the Company and Employee shall be construed to limit in any way the right of the Company to terminate the employment or service of the Employee at any time, or be evidence of any agreement or understanding, express or implied, that the Company will retain the Employee in any particular position, at any particular rate of compensation or for any particular period of time, it being expressly acknowledged and agreed by the Employee that his/her employment with the Company is governed by the terms of the offer letter.

9.    Successors and Assigns.  This Agreement is personal in nature, and neither this Agreement nor any part of any obligation herein shall be assignable by Employee. The Company shall be entitled to assign this Agreement to (a) any corporation resulting from any merger, consolidation or other reorganization to which the Company is a party or (b) any corporation, partnership, association or other person to which the Company may transfer all or substantially all of the assets and business of the Company existing at such time.

10.    Modification.  No modification of this Agreement shall be valid unless authorized by the President of the Company and set forth in a writing executed by Employee and a duly authorized representative of the Company.  The Parties hereto agree that in no event shall an oral modification of this Agreement be enforceable or valid.

11.    Enforcement.  In the event of a breach or threatened breach of any of the terms of this Agreement, the Company shall be entitled to an injunction restraining Employee from committing any breach of this Agreement without showing or proving any actual damages and without diminishing any other right or remedy which the Company may have at law or in equity to enforce the provisions of this Agreement.  Employee acknowledges a waiver of any rights he/she may have to require the Company to post a bond or other security with respect to obtaining or continuing any injunction or temporary restraining order and, further, Employee releases the Company and its officers and directors and waive any claims for damages against them which Employee may have with respect to the Company obtaining any injunction or restraining order pursuant to this Agreement.

12.    Severability and Judicial Modification of Agreement.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, assigns, legal representatives, heirs and distributees. This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to conflicts of law principles.  If any restrictions shall for any reason be held by a court of competent jurisdiction to be excessively broad as to duration, activity or subject, such restriction shall be construed so as to be limited or reduced to be enforceable to the extent compatible with applicable law as it shall then appear, it being understood that by the execution of this

{00660599.DOC;1 }

4

Agreement the parties hereto regard the restrictions contained herein as reasonable and compatible with their respective rights. Subject to the prior sentence, the invalidity or unenforceability of any provision in this Agreement shall not affect any other provisions hereof, and this Agreement shall be construed as if such invalid or any unenforceable provision were omitted.

13.    Jurisdiction.  All actions and proceedings relating directly or indirectly to this Agreement shall be litigated in any Federal or State Court having situs in New York County, New York, or by mutual agreement of the Parties, any other court, and that such courts are convenient forums and that both Parties hereby submit to the personal jurisdiction and venue of such courts.

14.    Construction.  Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision will be effective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement, and the remainder of such provision and the remaining provisions of this Agreement shall be interpreted, to the maximum extent possible, so as to conform to the original intent of this Agreement.

15.    Amendment; Waiver.  This Agreement may be amended, superseded, modified, supplemented or terminated, and the terms hereof may be waived, only by written instrument signed by the Parties or, in the case of a waiver, by the Party waiving compliance. No delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.  No waiver on the part of any Party of any such right, power or privilege, nor any single or partial exercise of any such right, power or privilege, shall preclude any further exercise thereof or the exercise of any other such right, power or privilege.  The rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies that any Party may otherwise have at law or in equity.  Each party hereby waives any right to trial by jury on any claim, counterclaim, setoff, demand action or cause of action whatsoever between them, arising out of or in any way pertaining or relating to this Agreement.

16.    Entire Agreement.  From and after the date of this Agreement, the provisions of this Agreement will control the rights and obligations of the Parties hereto with respect to the subject matter hereof.  However, reference is made to Section 2 hereof with respect to the rights and obligations of the parties hereto with respect to any breach of a prior agreement between the Parties, if any, relating to confidentiality, non-competition and non-solicitation arising prior to the effective date hereof.

17.    Acknowledgment.  Employee has carefully read all of the provisions of this Agreement and agrees that (1) the same are necessary for the reasonable and proper protection of the business of the Company, (2) the Company has been induced to enter into and/or continue its employment relationship with Employee in reliance upon his/her compliance with the provisions of this Agreement, (3) every provision of this Agreement is reasonable with respect to its scope and duration, (4) Employee has executed this Agreement without duress or coercion from any source, and (5) Employee has received a copy of this Agreement.

{00660599.DOC;1 }

18.     Knowing and Voluntary Execution.  Employee states and represents that he/she has carefully read and understood the foregoing Agreement, and that if Employee executes the Agreement, he/she has executed the same knowingly and voluntarily of his/her own free will, without any duress, being fully informed, after due deliberation and after sufficient time and opportunity to consult with the counsel of his choice.

19.     Advise New Employers.  Employee will, prior to accepting employment with any new employer, inform such employer of this Agreement and provide such employer with a copy of this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year first above written.

EMPLOYER:

Free Country, LTD.

By: _____

EMPLOYEE:

By: _____

EXHIBIT 3

FC-April 2014 Handbook

## ACKNOWLEDGMENT

### PLEASE READ THE FOLLOWING CAREFULLY,
### SIGN BELOW WHERE INDICATED AND
### RETURN TO THE OFFICE ADMINISTRATOR

I have read the Free Country LTD ("FC") Employee Handbook, and I understand its content. I also understand that this Employee Handbook contains employment information only, and in no way can or should be construed to be a contract of employment between FC and me. I understand that nothing contained in this Employee Handbook guarantees my employment for any specific duration of time.

I recognize that FC reserves the right to modify or delete any of the policies herein and to add additional policies at any time without prior notice.

I understand and accept that this Employee Handbook supersedes any and all prior policies and procedures that have been issued by FC, whether verbal or written, and that the policies in this Employee Handbook are effective immediately. I agree to follow the procedures and policies set forth in this Employee Handbook.

Print Name: _____Brian M. Drennen_____

Signature: _____Brian M. Drennen_____

Date: _____8/27/14_____

Date received by FC: _____8/27/14_____

- 34 -

EXHIBIT 4

FC-April 2014 Handbook

## ACKNOWLEDGMENT

PLEASE READ THE FOLLOWING CAREFULLY,
SIGN BELOW WHERE INDICATED AND
RETURN TO THE OFFICE ADMINISTRATOR

I have read the Free Country LTD ("FC") Employee Handbook, and I understand its content. I also understand that this Employee Handbook contains employment information only, and in no way can or should be construed to be a contract of employment between FC and me. I understand that nothing contained in this Employee Handbook guarantees my employment for any specific duration of time.

I recognize that FC reserves the right to modify or delete any of the policies herein and to add additional policies at any time without prior notice.

I understand and accept that this Employee Handbook supersedes any and all prior policies and procedures that have been issued by FC, whether verbal or written, and that the policies in this Employee Handbook are effective immediately. I agree to follow the procedures and policies set forth in this Employee Handbook.

Print Name: _Matthew Vander Wyden_

Signature: _____

Date: _11/23/2015_

Date received by FC: _____

- 34 -

# EXHIBIT 5

# EMPLOYEE HANDBOOK

## FREE COUNTRY, LTD

## APRIL 2014

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS............................................................................ i

INTRODUCTION  PURPOSE AND USE OF HANDBOOK ......................... 1

    1.   Equal Employment Opportunity................................................. 2

    2.   Employment Protection for Disabled Persons Under the Americans with Disabilities Act (ADA), New York State Human Rights Law, and New York City Code................... 2

    3.   Anti-Harassment Policy ............................................................ 3

        a.   Sexual Harassment ......................................................... 4

    4.   Complaint Procedure for all Discrimination and Harassment Complaints ............................................................ 5

    5.   No Retaliation ........................................................................... 6

    6.   Verification of Identity and Employment Eligibility...................... 6

    7.   Employees' Rights Under the NLRA........................................... 7

A.   Employment at FC........................................................................... 7

    1.   Full-Time Employment............................................................... 7

    2.   Personnel Records ................................................................... 8

    3.   Standards of Conduct............................................................... 8

    4.   Confidential Information ........................................................... 10

    5.   Travel ..................................................................................... 11

        a.   Phone Calls ................................................................... 11

        b.   Car Service ................................................................... 11

        c.   Meals ............................................................................ 12

        d.   Expenses ...................................................................... 12

    6.   Absenteeism/Lateness Policy ................................................. 12

    7.   Outside Employment ............................................................... 12

    8.   Smoking ................................................................................. 13

B.   Safety and Security ....................................................................... 13

    1.   Emergency Procedures/Emergency Action Plan......................... 13

    2.   Office Security ........................................................................ 14

C.   Benefits ........................................................................................ 15

    1.   401(K) Retirement Savings Plan .............................................. 15

FC-April 2014 Handbook

|  |  |  |  |  |
|---|---|---|---|---|
|  | 2. | Health Care | .................................................. | 15 |
| D. | Time Away | .................................................. | 16 |
|  | 1. | Family and Medical Leave | ............................. | 16 |
|  | 2. | Sick Days and Other Absences | ..................... | 18 |
|  |  | a. | Sick Days | .................................. | 18 |
|  |  | b. | Bereavement | ............................. | 19 |
|  |  | c. | Jury Service | ............................... | 20 |
|  |  | d. | Military Leave | ............................ | 20 |
|  |  | e. | Unexcused Absences | .................. | 20 |
|  | 3. | Holidays | ........................................ | 20 |
|  | 4. | Vacation Policy/Personal Time Off (PTO) | ........ | 21 |
| E. | Hours and Breaks | .................................. | 22 |
|  | 1. | Office Hours | ........................................ | 22 |
|  | 2. | Lunch Breaks | ..................................... | 23 |
| F. | Employee Pay Practice | ............................. | 23 |
|  | 1. | Payroll | ............................................. | 23 |
|  | 2. | Review Your Pay Stub | ............................. | 23 |
|  | 3. | Payroll Deductions | ................................ | 24 |
|  | 4. | Salary Review and Bonuses | ..................... | 24 |
|  | 5. | Recording Time | .................................. | 24 |
|  | 6. | Overtime | ......................................... | 25 |
|  |  | a. | Exempt Employees and "Safe Harbor" Policy | .................. | 26 |
| G. | Use of Technology and Equipment | ............... | 26 |
|  | 1. | Use of Telephones | ............................... | 26 |
|  | 2. | Computer, Email and Internet Use | ............. | 27 |
|  |  | a. | No Expectation of Privacy | ............. | 27 |
|  |  | b. | FC Computers, Software, and Information System Tools | ................. | 28 |
|  |  | c. | Misuse of Internet | ..................... | 28 |
|  |  | d. | Misuse of Electronic Mail (Email) | .... | 29 |
|  |  | e. | Use of Laptops, BlackBerrys, Smart Phones and Other Electronic Devices | ......... | 30 |
|  |  | f. | Care of Equipment and Facilities | ..... | 31 |

FC-April 2014 Handbook

        g.     Personal Blackberrys, Smartphones, Cellular
Telephones, or Similar Devices ........................................ 32

        h.     Failure To Comply ......................................................... 32

   H.    Social Media................................................................................. 32

      1.     Social Media Policy and Procedures and Social
Networking Policies and Procedures............................................ 32

      2.     Disclaimer................................................................................ 33

DISCLAIMER.................................................................................................. 33

ACKNOWLEDGMENT……......................................................................... 34

- Committing or condoning any unlawful discrimination or harassment in any aspect of employment, including but not limited to hiring, firing, pay, promotion, transfer, development, or terms and conditions of employment;

**4.   Confidential Information**

It is the policy of FC to ensure that the business affairs of the Company are kept confidential and not discussed with individuals outside the organization, except where required in the normal course of business. In addition, the Company considers its relationship with its customers, suppliers, vendors, consultants, directors, legal and other advisors as being of the utmost confidence.

For purposes of this Handbook, Confidential Information includes, but is not limited to: (i) any non-public information of a confidential or sensitive nature concerning the operations or activities of FC, its owners, officers, directors, shareholders, employees, customers, suppliers, vendors, consultants, directors, legal and other advisors; (ii) information of a commercially sensitive, proprietary or personal nature or that, if disclosed, could have an adverse effect on FC or any of its owners or principals, including their standing in the community, their reputations, business operations or competitive positions; (iii) information including FC's designs, specifications, plans, formulae, methods, processes, trade secrets, patents, financial or other business data, business plans and photographs, employee records, prospective customers, customer, supplier and vendor information, pricing of products and services, or other information regarding FC's products or services.

Each employee agrees that he/she will not, at any time whether during his/her employment or at any time after his/her employment terminates for any reason and regardless of whether said employment is terminated by FC or by the employee, divulge or utilize any of the Confidential Information except in the normal course of his/her

duties on behalf of FC.  Confidential Information includes material and information in all formats, whether electronic or otherwise.  Any employee who misappropriates for his or her own use or engages in the unauthorized disclosure of Confidential Information to other persons, organizations or entities, without prior permission from FC, will be subject to disciplinary action (up to and including immediate termination) and legal action regardless of whether the disclosure of the Confidential Information provides a benefit to the employee.  Confidential Information may be exchanged among FC employees on a need-to-know basis in connection with regular FC business.  Any employee who is not certain whether someone is authorized to receive certain Confidential Information, should immediately consult with his or her supervisor to discuss the matter before any such disclosure is made.

**5.**     **Travel**

All travel itineraries and costs, including airfare must be approved by an employee's supervisor prior to purchase.  Any changes to a travel itinerary that results in an additional cost must also be pre-approved.  Purchases must be done with a corporate credit card.  FC does not pay for airline seat upgrades.

**a.**     **Phone Calls**

When calling the NY office while traveling, use our toll free number, 1-888-FREE-NYC.  Air plane phones should not be used.

**b.**     **Car Service**

Our corporate car service should be used for transportation in New York City. See your manager for details.  When out of state, please determine whether it is more economical to use a car service or to rent a car.

discouraged except when absolutely necessary, and then limited to the necessary business of the call.

### 2.   Computer, Email and Internet Use

FC's Computer, Email and Internet facilities (collectively, the "Electronic Facilities"), are provided as tools to be used for FC business only.  Personal use is not permitted.  All employees must adhere to FC policies concerning Computer, Email and Internet usage. Violation of these policies could result in disciplinary and/or legal action leading up to and including termination of employment.  Employees may also be held personally liable for damages caused by the violation of any policy.

### a.     No Expectation of Privacy

Employees do not have an expectation of "privacy" with respect to their use of FC's Computer, Email and Internet facilities.  Keep in mind that the FC owns any communication sent via email or that is stored on company equipment.  Management and other authorized staff have the right to access any material in your email or on your computer at any time.  Please do not consider your electronic communication, storage or access to be private if it is created or stored at work.  Any and all emails, messages, data, images or other information composed, transmitted, received or archived using FC's Electronic Facilities are owned by FC and may be accessed, reviewed, copied and used by FC at any time.  Employees should also understand that any such email messages, data, and images, may be subject to disclosure to third parties such as regulators, law enforcement agencies, and the courts.  FC reserves the right at its sole discretion to monitor, log, and filter (restrict) access by employees to any of FC's Electronic Facilities.

### b.     FC Computers, Software, and Information System Tools

In order to minimize problems with FC's Computer Facilities, preserve valuable

data, and secure FC's network, the following must be followed by all FC employees:

- All network passwords must be kept confidential.

- Software cannot be downloaded from the Internet onto FC computers without prior authorization from FC's IT Manager.  All software must be approved by the IT Manager prior to installation.  This includes, but is not limited to, screen savers, backgrounds, etc.

- All software on FC computers must be legally licensed.

- All electronic information contained on external CD's, flash drives, thumb drives, etc. may not be uploaded onto the FC's Computer Facilities without the prior express approval of the IT Manager.

- The unauthorized use, copying, transmittal or deletion of any electronic information from FC's Computer Facilities is strictly prohibited.

### c.     Misuse of Internet

FC's Internet Facilities are made available to employees and other authorized

individuals for FC-related business use.  Prohibited use of the FC's Internet Facilities

includes, but is not limited to:

- Viewing, displaying, copying, transmitting or communicating material that is libelous, pornographic, obscene, threatening, and/or sexual in nature;

- Viewing, displaying, copying, transmitting or communicating material that promotes hate, violence, unlawful harassment, unlawful discrimination, a hostile workplace, or otherwise violates FC's Anti-Discrimination or Anti-Harassment policies.

- Utilizing FC's Internet Facilities to support an outside business activity, whether it is a commercial venture, charitable or political cause, or other private undertaking.

- Playing games.

- Placing, posting, or making available any FC-related content without express authorization.  This includes, but is not limited to, confidential

information related to FC's services, clients, fiscal matters, vendors and employees.

### d.   Misuse of Electronic Mail (Email)

Email is a business tool to be used only for business communications among employees and other authorized users.  Confidential Information must not be shared outside of FC, without authorization, at any time. You are also not to conduct personal business using FC's computers or email.

Please keep this in mind, also, as you consider forwarding non-business emails to associates, family or friends. Non-business related emails waste FC time and attention.

The following uses of email are strictly prohibited and should be immediately reported to the Office Administrator if received:

- The creation, transmittal, exchange or storage of messages (including, but not limited to, jokes), which are defamatory, discriminatory, abusive, sexually-oriented, harassing, obscene, or threatening.

- The creation, transmittal, exchange or storage of unapproved advertisements or solicitations.

- The creation, transmittal, exchange or storage of messages that are inauthentic, forged, or untraceable to the sender.

- The creation, transmittal, exchange or storage of chain letters.

- The creation, transmittal, exchange or storage of messages for personal gain, or non-FC fundraising, business, political, charitable, or religious activity.

- The creation, transmittal, exchange or storage of messages in violation of any federal, state, or local law or FC policy, including but not limited to FC's Anti-Discrimination and Anti-Harassment Policies.

- Subscribing to non-business related Internet mailing lists.

Email messages should be handled in the same manner that paper documents are handled.  All users are required to take appropriate measures to secure confidential, privileged, proprietary or sensitive information.  If there is a legitimate business need to send such information via e-mail, such messages are to be routed only to those with a legitimate need to know.  It must have appropriate marking that such messages are privileged, confidential, proprietary or contain sensitive information, and if necessary, messages should be encrypted.

All e-mail, including all information stored, transmitted, received or contained in the FC's e-mail systems, is the sole property of FC.  No user is entitled to any expectation of privacy with respect to e-mail communications, including but not limited to, the creation, transmittal, or exchange of e-mails to or from a personal e-mail account through FC's Internet Facility.  To ensure compliance with this policy, FC reserves the right to monitor the use of any FC property, equipment, phone line, computer, software, or any storage device.  Violation of this policy may result in disciplinary action, up to and including termination of employment.

### e.  Use of Laptops, BlackBerrys, Smart Phones and Other Electronic Devices

All communications and information created on, transmitted by, received from, or stored on FC's Electronic Facilities maintained on any laptop, BlackBerry, Smart Phone, iPad or other mobile device (collectively, the "Electronic Devices"), whether or not issued by FC, remain the sole property of FC.  Additionally, any Confidential Information, including FC emails, created on, transmitted by, received from, or stored on any Electronic Device, whether or not issued by FC, remains the sole property of FC and must be kept secured and protected from unauthorized disclosure.  Any Electronic